81 616
96 309
96 316

81 616
97 245

81 616
99 310

81 616
102 180

81 616
119 100
119 586

## ALONZO H. BRADY v. THE TOLEDO, ANN ARBOR & NORTH MICHIGAN RAILROAD COMPANY.

*Railroad companies—Injury at crossing—Contributory negligence.*

1. In this case the plaintiff is held to have been guilty of contributory negligence in attempting to cross a railroad track at a crossing so obstructed by intervening objects that he could not see a train approaching from one direction until he was within 20 or 25 feet of the crossing, and then only for a few rods up the track, without first stopping his team, and taking some precaution to see if a train, which he knew was about due, was approaching.

2. The following principles have been settled in this State as to the degree of care which a person must exercise in approaching and passing over a railroad track where it intersects a highway:

   *a*—He is bound to recognize the danger, and make use of the sense of hearing and sight to ascertain, before attempting to cross, whether a train is in dangerous proximity. If he neglects to do this, and ventures blindly upon the track, it must be at his own risk; and such conduct should be pronounced negligence by the courts, as matter of law; citing *Railroad Co. v. Miller*, 25 Mich. 274.

   *b*—A person familiar with a railroad crossing, having been frequently over it, and knowing its location, when approaching it is under the highest possible obligation to observe such precautions as are needful to avoid a collision, and a failure so to do is contributory negligence that will prevent a recovery for damages, if any accrue; citing *Haas v. Railroad Co.*, 47 Mich. 401.

   *c*—If a person approaches a railway crossing without reasonable caution and care, particularly when a fast train is due and

approaching, and by reason thereof his team becomes unmanageable, goes upon the track, and injury results, there is such contributory negligence as will prevent a recovery; citing *Rhoades v. Railway Co.*, 58 Mich. 263.

Error to Gratiot.  (Hart, J.)  Argued June 4, 1890. Decided July 2, 1890.

Negligence case.  Defendant brings error.  Reversed. The facts are stated in the opinion.

*T. W. Whitney,* for appellant.

*J. Lee Potts,* for plaintiff.

LONG, J.  We are satisfied that the judgment in this case cannot be sustained upon reason or authority.

The plaintiff, while traveling southward with a team of horses hitched to a lumber wagon, on which he was riding, along a public highway in the town of North Star, Gratiot county, attempted to cross over the railroad track of the defendant company, and was struck by the engine of a passing train, and injured.  He also claims damages for killing one of his horses, and damage to his wagon and harness.  He brought his action in the Gratiot circuit court, and recovered a verdict and judgment for $1,500.  Defendant brings error.

The claim of plaintiff on the trial below was that his injuries resulted from the neglect of the engineer to ring the bell or blow the whistle, and that he was exercising due care in making the crossing.  There was some considerable evidence, *pro* and *con,* as to whether the whistle was blown or the bell rung as required by the statute, which we need not discuss.

It appears that the railroad track, for some distance before crossing the highway, runs through an orchard; and the trees, coming near the surface of the ground, partially obscure the view, with other trees and bushes

there, of persons going southward, of any train going to
the south-east. The crossing is but a short distance from
North Star station, and the track crosses the highway
obliquely. The highway extends from north to south, and
the railway runs in a north-westerly and south-easterly
direction. The plaintiff was well acquainted with the
crossing, and had lived within three and one-half miles
of it for six years, traveling over it many times.

On the morning of June 24, 1887, he was driving his
team, attached to a lumber wagon, going south along
this highway. The wagon had no box on, and had in a
long reach. Plaintiff was going for lumber. He was sit-
ting on the hounds between the hind wheels, driving,
with both feet upon the same side of the hounds, and
partially facing the horses, and with his back to the
north-west. The train was the morning passenger, and
coming from the north-west; some of the testimony show-
ing it a little behind time, and going at rapid speed.
It was due at North Star station, a mile south from the
crossing, at 8 o'clock A. M. The plaintiff knew the time
the train was due at North Star station, and knew it
was about train time when he was approaching the cross-
ing. He describes the condition of this crossing as it
existed at that time, and the manner in which the trains
upon the railroad track are obscured from the view of
persons approaching the crossing from the north, with
great particularity. He says the first intervening object
is a barn, the next a hen-house, and the next an orchard
and poplar trees along the highway; that the trees in the
orchard were large, and stood some two rods apart, and
at that season of the year the leaves were of full size,
the tops of the trees coming together, and the trees
came down to within five or six rods of the crossing;
that there were brush along the highway to near the
railroad; that the right of way of the railroad through the

orchard is only 30 feet wide, and there is a cut about two feet deep below the surface, the dirt being thrown out on either side, forming an embankment from 20 inches to 3 feet in height; and that he could not have seen a train approaching from the north-west, until he was within 20 to 25 feet of the crossing, by reason of these obstructions to his view.

The plaintiff also tells his story as to how he drove along the highway, and the care he exercised in approaching the crossing, from which it appears that, for some distance before reaching the crossing, his team at times were permitted to walk, and at other times were trotting along slowly; that they trotted down to within five or six rods of the crossing, and from there walked upon and across it. When arriving at the crossing, the nigh horse hung back a little, and the plaintiff urged her with the lines to go across; and, just as the team crossed the track, the wagon was struck by the engine, and the injuries complained of resulted. He did not stop his team before reaching the crossing, or before he was struck. When his attention was called to the manner of his approach, and what he did, he stated that he looked and listened. He was asked:

" Q. What had you done before that,—before you came up to the railroad track, and urged your horses on?
" A. I looked.
" Q. Which way did you look?
" A. I looked down the track first, because I could see down the track better than I could see up?
" Q. Your horses on a walk?
" A. Yes, sir.
" Q. Go on, and state to the jury what the extent was of your looking down the track.
" A. Well, I looked down the track. I saw the freight-car on the side track there, and then I turned and looked up the track as far as I could, but I could not see any further than that tree.

" *Q.* Then at that time your horses' feet were pretty near up to the track, and you looked up the track?

" *A.* Yes, sir. I heard nothing or saw nothing at all. Then I urged the horses to go across the track, and they just got across; and I think I was just in the act of looking, just as the whistle blew, because I saw the steam from that whistle. I slapped the lines on the horses, and the train struck me."

The plaintiff further testified that he listened all the way from the corner down, as he had it on his mind that the train was due. On his redirect examination the plaintiff was asked if he could give any reason why he did not hear the whistle blow at the other crossing above that, and testified that the wind was blowing from the south, or south-west, and would have blown the sound from him; that he was sitting on the hounds of the wagon, between the hind wheels, his head not coming as high as the horses' backs; and that, before reaching the crossing, there is a depression in the highway about four or five rods from the track, and from there a gradual rise over the track.

Substantially, this is the claim made by the plaintiff upon the trial. Other witnesses were called who testified that they heard the train coming,—had heard it whistle some distance up the track,—and, seeing that the plaintiff was driving along towards the crossing, attempted to call his attention to the approach of the train, and failed.

At the close of the testimony the counsel for the defendant requested the court to charge the jury—

" That this plaintiff, having admitted in his own testimony that he knew the train was about due, coming from the north, at the time he attempted to cross the track, and also that he was familiar with the dangerous character of the crossing, must be held guilty of contributory negligence in not stopping his team, and listening for the approach of the train."

The circumstances surrounding this case, and the testimony given by the plaintiff himself, warranted this request, and it was error to refuse it. The burden was upon the plaintiff to show, not only the negligence of the defendant, but that he exercised due care in attempting to make the crossing.

The court not only refused this request, but charged the jury that—

"It was the plaintiff's duty to use both his eyes and ears in determining whether or not the train was coming, and, in case his wagon was making so much noise as to interfere with his hearing, he should have stopped and listened. But, if his team and wagon were not making so much noise as to interfere with his hearing, I can't see any reason for his stopping his team for the purpose of listening to hear the train coming; and, if it should be found necessary to stop in order to hear more clearly if the train was coming, he should have stopped."

The circumstances stated by the plaintiff himself show conclusively that he was not using ordinary care in approaching the crossing. Here was a crossing so much obstructed by intervening objects that, according to his testimony, he could not see a train coming from that direction—riding as he was, upon the hounds of his wagon—until he was within 20 or 25 feet of the crossing, and then only a little distance up the track,—some few rods. He was riding with his back turned in the direction from which the train was approaching, and he knew that it was about time for its approach; and yet he drove along, and upon the track, without stopping; and, even when his horse halted on reaching the track, he urged her forward with the lines. Conceding that he could not see the train until he got so far upon the track he could not save himself, it then became the more important that he should listen before he was placed in a position of peril. This was a duty he owed not only to himself, but

to the passengers and others who were upon the train. Before arriving there, he knew the crossing was a dangerous one,—that he would not be able to see a train approaching from the north-west until nearly upon the track,—and he was aware that it was about time for the train to pass; and yet, riding low down between the wheels of the wagon, which must be presumed to have made some noise, and with the wind blowing in the direction which would carry the sound of the approaching train away from him, he drove down and upon the crossing without stopping, and even urging his horses upon the track when they hesitated to cross. It was shown further that there was a mill near the crossing, which was in operation, and creating some noise and confusion. Others standing near there saw the train approaching, and had heard the sounding of the whistle at the crossing above. Some of them attempted to call the attention of the plaintiff to the train's approach, but were unable to do so, as he appeared to take no note of what was passing. As the facts are presented by this record, it was the duty of the plaintiff to have stopped his team, and to have taken some precaution to ascertain if the train was approaching, which he knew was about due. He was severely injured, and met with great damage and loss; but the case made did not present issues for the determination of the jury, as, from his testimony, it was made to appear that his own negligence and want of care caused, or at least contributed to, the injury. It is not clear that the injury would not have happened had the whistle been sounded and the bell rung, as required by the statute.

The following principles have been settled in this State as to the degree of care which one circumstanced as the plaintiff was must exercise in approaching and passing over a railroad track where it intersects with a highway:

A person about to cross a railroad track is bound to recognize the danger, and to make use of the sense of hearing and sight to ascertain, before attempting to cross, whether a train is in dangerous proximity. If he neglects to do this, and ventures blindly upon the track, it must be at his own risk; and such conduct should be pronounced negligence by the courts, as matter of law. *Lake Shore, etc., R. R. Co. v. Miller*, 25 Mich. 274.

A person familiar with a railroad crossing, having been frequently over it, and knowing its location, when approaching the same is under the highest possible obligation to observe such precautions as are needful to avoid a collision; and failure so to do is contributory negligence that will prevent recovery for damages, if any accrue. *Haas v. Railroad Co.*, 47 Mich. 401.

If a person approaches a railway crossing without reasonable caution and care, particularly when a fast train is due and approaching, and by reason thereof his team becomes unmanageable, goes upon the track, and injury results, there is such contributory negligence as will prevent a recovery. *Rhoades v. Railway Co.*, 58 Mich. 263.

A greater duty was imposed upon the plaintiff in the present case by the fact that he knew the crossing to be a dangerous one. He knew its condition, and that he would be unable to see the train until arriving at the crossing. He had no right to close his ears, and drive along without stopping, when he must have known that the noise of his wagon, and of the mill, would shut off the sound from the approaching train. But it appears that even after his horses reached the track, and hesitated, he then gave his attention to them, and urged them across, without giving any attention as to whether the train was coming or not. As the record is now presented, the plaintiff's own testimony shows such want of care that

the jury should have been directed to return a verdict for the defendant.

The judgment must be reversed, and a new trial granted.

The other Justices concurred.